UNITED STATES *v.* MCCURRACH ORGANIZATION, INC.

**No. 6765.**—Invoices dated Langley, Macclesfield, England, August 1942, etc.
  Certified September 1942, etc.
  Entered at New York, N. Y., January 15, 1943, etc.
  Entry No. 716768, etc.

Third Division, Appellate Term

(Decided January 15, 1947)

*Paul P. Rao*, Assistant Attorney General (Daniel I. Auster, special attorney), for the appellant.
*Benjamin A. Levett* (*Meyer Ohlbaum* of counsel) for the appellee.

Before CLINE, KEEFE, and EKWALL, Judges; CLINE, J., dissenting

KEEFE, Judge: These appeals for review of the decision of the trial court in reappraisement (Reap. Dec. 6248) involve the value of

certain hand-printed foulard silks and wool cashmere for neckties. The Government contends that the evidence presented before the trial court fails to establish that the entered or claimed values represent the correct values of the merchandise on the dates of shipment; that the plaintiff failed to present *prima facie* evidence that the values were other than as returned by the appraiser; and that the evidence fails to establish that the sales made at or before the dates of shipment were not made in the ordinary course of trade.

The evidence discloses the following facts. The imported silk material was 18-momme Japanese silk originally imported into England in the gray or raw condition from Japan. The English manufacturers process it by printing and dyeing into materials suitable to be used in the manufacture of neckties. In such condition it is shipped to manufacturers of neckties in the United States, each of the purchasers supplying the patterns and particular colorings desired at the time the orders are placed. The silk material, shipped by the various manufacturers of tie silks in England to the United States manufacturers of neckties, is similar in all respects except as to distinctive patterns and colors.

In July 1941, the British Government placed an embargo upon silk imported from Japan. By reason thereof, all that remained for trading purposes, after receipt of such silk goods as were in transit at that time, was material in the English warehouses. According to the affidavit of the director of A. O. Aldwinckle & Co., Ltd., the shipper of the instant goods, the last shipment of Japanese silk in the gray received by that firm was October 25, 1941; and that after February 4, 1942, no sales, nor offers for sale of silk material such as or similar to the imported goods, were made. The affidavit also discloses, however, that the production of fabrics such as or similar to the imported merchandise did not cease until November 1942. It is further indicated therein that the time required to receive the "loom state goods from Japan" averaged 9 months and thereafter the production thereof into tie silks averaged 7 months.

We fail to find anything in the record to establish that the wool cashmere was imported from Japan in the raw condition. Nor is there anything to establish that an embargo was placed on such wool cashmere.

The affidavit of Arthur Charles Davis, a director of Brocklehurst-Whiston Amalgamated, Ltd., competitor of the exporter herein and the exporter of a shipment of similar merchandise to Bachrach Co. of New York, admitted in evidence as exhibit 2, discloses that that firm ceased to import silk from Japan and to trade in that class of fabric prior to May 1941. The affiant expressed the opinion that the firm's "last regular sale" was in May 1941. However, the company had a quantity of the Japanese silk material on hand in May 1941, which

it decided in November 1941 to sell; the basic price being fixed at 8 shillings a yard, dye and two-color printing.

Exhibit 3, consisting of an invoice of necktie silks from Brockle-hurst-Whiston Amalgamated, Ltd., to Bachrach Co., discloses that a contract was entered into by said exporter with Bachrach Co. on November 25, 1941, at the price of 8 shillings for two-color handblock prints, the prices varying according to colors.

The president of the appellee testified that his order for necktie silks was placed in the usual manner, that is, a contract was entered into for say 5,000 yards at a fixed price, which the British firm would import from Japan for the appellee's account. Usually thereafter the actual patterns and colorings would be chosen and an order entered; the prices, however, being based on the contract price for one color, and, if additional colors were used, standard additions would be made. The basic contract price was paid regardless of the time it took to import the raw goods into England and process the same, ready for export to the United States.

Certain exhibits consist of invoices of silk foulard and wool cashmere tie materials. These exhibits disclose the dates of contracts as well as the dates the orders were placed and the consular dates.

According to the invoices of the instant goods, contracts were con-summated on January 23 and September 19, 1941, as to the silk goods. The contract for the wool cashmere was entered into on November 10, 1939. The wool cashmere and the tie silk materials were ordered on April 9, 1942. In reappraisement 151146–A, the invoice was consulated in September 1942, and the merchandise was entered on October 11, 1942. In reappraisement 152201–A, the invoice was consulated in October 1942, but the merchandise was not entered until March 30, 1943. In reappraisement 152202–A, the invoice was consulated in September 1942, and there also the mer-chandise was entered on March 30, 1943. Exhibit 6 covers an invoice of tie silks shipped by A. O. Aldwinckle & Co., Ltd., to Franc-Stroh-menger & Cowan, Inc., of New York, pursuant to a contract dated February 4, 1942, and on an order dated April 10, 1942, the goods being shipped in September 1942 and entered on November 9, 1942. This shipment is evidently the one referred to in exhibit 1 as the sale of the remainder of the merchandise on hand made on February 4, 1942.

Exhibit 4 discloses that said firm shipped wool cashmere tie ma-terials to Stern Merritt & Co., Inc., of New York, pursuant to an order accepted February 24, 1942, and referred to a contract dated January 30, 1942. The shipment was consulated on June 15, 1942, and the goods were entered on July 14, 1942. Exhibit 3, referred to heretofore, is an invoice disclosing that Brocklehurst-Whiston Amal-gamated, Ltd., shipped comparable tie silks to Bachrach Co. of New

York, pursuant to a contract dated November 25, 1941, on an order taken June 23, 1942. The consular date on the invoice appears as September 1942, and the goods arrived in this country on October 14, 1942. According to the testimony of Examiner Fitzgerald, the latter shipment formed the basis of the appraiser's advance in value of the shipments here before us, the advance being approximately 2 shillings higher than the invoiced or claimed values of the goods in question.

Arthur N. Bachrach, the purchaser of the goods covered by exhibit 3, testified that an offer was made to him by the foreign manufacturer and that he accepted it in the usual manner and purchased the goods; that there were no restrictions on the prices; that the sale was not made at special prices for large quantities, nor did he receive a special discount; that the goods were in the wholesale quantities in which he usually made his purchases and he paid the prices shown on the invoice, although such prices were higher than prices he had previously paid for similar merchandise. He further testified that he knew that such goods were scarce and he was glad to get them at what he considered a reasonable price, even though the shipper had indicated in his affidavit that that price, in his opinion, was inflated and disproportionate in comparison with the usual trade price.

The trial court was of the opinion that the offer, sale, and purchase of this class of merchandise in England were not normal and not in the ordinary course of trade after the purchase from Japan of silk goods had been prohibited by the English Government, and that the affidavit of Frank Leslie Freegard, exhibit 1, was sufficient to establish that the entered or claimed values constituted the export values of the merchandise rather than the appraised values.

From a careful examination of all the evidence produced in this case, we are unable to agree with the court below. In our opinion, the export value is the proper value, but the appellee (plaintiff below) failed to establish that such statutory value is other than the value returned by the appraiser. The evidence of cost of production, as contained in exhibit 1, is insufficient inasmuch as under the statutory formula the item of profit is to be measured by the profit ordinarily added by manufacturers engaged in the production of merchandise of the same class or kind, other than the manufacturer of the merchandise under consideration. See *Perez* v. *United States*, Reap. Dec. 6402. The record before us is deficient on that point.

As we view this controversy, the question for decision is whether or not merchandise such or similar to the imported merchandise was freely offered for sale to all purchasers in the principal markets of the country from which exported on the dates of exportation of the instant goods, in the usual wholesale quantities and in the ordinary

course of trade, for exportation to the United States, as provided for under section 402 (d) of the Tariff Act of 1930.

We are not impressed with appellee's theory that because the importation of Japanese silk had ceased, sales made thereafter were not in the ordinary course of trade. The silk trade with Japan terminated in July 1941. According to appellee's theory, business thereafter was not conducted in the usual course of trade. However, the silk goods covered by the reappraisements herein were ordered nearly a year after the freezing order became effective, and as to the goods covered by reappraisement 152202–A, the invoice discloses that the contract with the importer herein was entered into 2 months after said freezing order. Franc-Strohmenger & Cowan, Inc., entered into a contract with the same shipper over 6 months after the freezing order, and the order for the tie silks was placed about 9 months after such freezing order. The same shipper accepted an order from Stern Merritt & Co., Inc., in February 1942, and the goods were shipped in June of that year. The merchandise, covered by the invoices disclosing such contracts and orders, was priced the same as the goods here at issue, and the same advances were made by the appraiser. Bachrach entered into a contract with a competitive manufacturer in November 1941. These tie silks, which were imported about the same time as the tie silks in question, were ordered on June 23, 1942, nearly a year after the freezing order. As heretofore shown, orders were placed for the goods at bar on April 9, 1942. It must be presumed in the absence of evidence to the contrary that all such data, required by law to be disclosed upon invoices, are representative of the facts.

As the basic price for the finished product was agreed upon when the contracts were placed, are we to hold that contracts entered into in January and September 1941, as forerunners of orders placed in April 1942, were made in the ordinary course of trade in such free market as would conform to the statutory formula for export value and reject a contract entered into in November 1941, which was followed up by an order placed in June 1942, as not being in the ordinary course of trade?

If, as contended by the appellee, the freezing order of the British Government destroyed the free market, there would be no market in the statutory sense after July 1941. Therefore, export values would apply only to merchandise ordered pursuant to the contract of January 1941, and the entered or claimed values, as the case may be, of the merchandise herein, the purchase of which was initiated through the contract of September 1941, would not conform to the statutory formula of export value, as claimed by the appellee and as held by the court below.

The apparent discrepancy in the affidavit of the shipper, exhibit 1, between the last sale or offer for sale of such silk material and the

time the firm ceased production, a period of 8 months, is owing to the fact that the prices of such merchandise were fixed at the time contracts were entered into for the raw material rather than at the time the particular necktie materials were ordered, and the sales or offers for sale were based upon the contracts, apparently, rather than upon the orders for the tie silk materials. We are of the opinion, however, that the orders of the tie silk materials and the sales thereof were in the ordinary course of trade, even though the freezing order prohibiting the importation of Japanese raw silk had become effective before such orders were placed.

The sale by Brocklehurst-Whiston Amalgamated, Ltd., to Bachrach Co. was at a higher value than the sales made by A. O. Aldwinckle & Co., Ltd., to its customers in the United States. Such sale was the latest in point of time. In the absence of evidence to establish that such merchandise was either offered for sale or sold at a lower price at the time of exportation of the goods to Bachrach Co., it must be presumed that the prices at which Brocklehurst-Whiston Amalgamated, Ltd., freely offered for sale for future delivery and sold its merchandise to Bachrach Co., were the existing quoted prices on the dates of exportation of the merchandise herein.

The case of *Blumenthal & Co., Inc.* v. *United States*, 12 Ct. Cust. Appls. 176, T. D. 40166, involved Tussah silk, orders for which were placed in Switzerland for future delivery. The merchandise was appraised at the highest quoted price which prevailed from 2 to 4 months before the exportation of the merchandise. The goods were reappraised at the highest price under which deliveries had been made, which were less than the quoted prices. The appellate division reversed the lower court, reappraising the goods at the highest price quoted as found by the appraiser. Our appellate court sustained the appellate division, giving as its reasons the following:

\* \* \* first, because the price of Tussah silk in Switzerland was rapidly advancing and was the existing quoted price on the date of the exportation; second, because the seller as a business proposition would not fix a price which was not warranted by the law of supply and demand \* \* \* third, because \* \* \* the price at which the goods were offered was the selling price for Tussah silk for future delivery. \* \* \* fourth, because the importer himself \* \* \* had no reason to believe that he could buy at a less price \* \* \* fifth, because 135 francs must be presumed to have continued to be the selling price from March 20 to June 17, 1920, in the absence of evidence establishing that during that period Tussah silk was either quoted or sold at a less rate.

In *White, Lamb Finlay, Inc.* v. *United States*, 29 C. C. P. A. 199, C. A. D. 192, the merchandise was manufactured solely for export to the United States. It was freely offered for sale to all purchasers at the time of exportation of that merchandise and subsequently thereto

for future delivery. It was contended by the plaintiff that the value of 6 Belgian francs, based upon the price at which the goods were being offered for future delivery, was not the proper export value because at the time of such offers no goods were on hand nor could be produced for reasonably prompt delivery. The court was of the opinion that "the expression in section 402 (d)—'freely offered for sale to all purchasers * * * for exportation to the United States'—is not ambiguous, and we have in effect so held." The court pointed out that in *Sandoz Chemical Works* v. *United States*, 13 Ct. Cust. Appls. 466, T. D. 41365, it was held that the statute does not require a sale of the product. It is sufficient if it be freely offered for sale. The appellate court held that the free offer for future delivery of such or similar merchandise constituted very substantial evidence such as would warrant the finding of export value of the merchandise at the time of exportation; that it is presumed the appraiser found every fact to exist necessary to sustain his appraisement; that it therefore must be presumed that the appraiser found that there could be prompt delivery of the merchandise; and that the rule obtains that free offers of merchandise for future delivery establish a market price if the delivery can be prompt.

For the reasons stated we make the following findings:

1. That the merchandise consists of 18 momme Japanese silk imported into England in the gray condition and there printed and dyed in colors and patterns suitable for manufacture into neckties, and wool cashmere suitable for use for the same purpose.

2. That merchandise such or similar to the merchandise imported herein is dyed and colored in individual patterns suitable for the United States trade and similar merchandise was not sold in Great Britain for home consumption.

3. That the export value, as such value is defined in section 402 (d) of the Tariff Act of 1930, is the proper value of the merchandise.

4. That the silk merchandise was freely offered for sale for export to the United States, in the absence of evidence to the contrary, at the basic price of 8/- per yard, dye and two-color printing, the basis of value used by the appraiser in his finding of the appraised value.

5. That the merchandise herein consisting of wool cashmere, in the absence of evidence to the contrary, is properly valued at the export value returned by the appraiser as the value of the merchandise.

6. That the export value of the merchandise herein is as set forth in paragraphs 4 and 5 of our findings.

We conclude, as matter of law, that the value of the merchandise herein is as set forth in paragraphs 4 and 5 of our findings herein, and corresponds in all particulars with the value returned by the appraiser as the export value of the merchandise. The decision and judgment of the trial court are therefore reversed, and judgment will be rendered accordingly.

DISSENTING OPINION

CLINE, Judge: I regretfully dissent from the majority.

The evidence shows that the silk was originally imported from Japan into England where it was printed and dyed according to patterns supplied by the respective purchasers. It was the custom of the trade to enter into contracts of purchase at fixed basic prices. The patterns were selected later, an order was entered, and the merchandise was made up for export. In the instant case the contract dates are January 23, 1941, and September 19, 1941. The orders were entered April 9, 1942, and the goods were exported on October 1, 16, and 30, 1942.

The goods were appraised on the basis of export value. The importer claims that export value is the correct basis of appraisement but contends that it is represented by the entered values in reappraisement No. 151146–A and the claimed values in reappraisement Nos. 152201–A and 152202–A. As an alternate claim, plaintiff contends that the dutiable value is the cost of production.

The evidence discloses the following situation in regard to this material. In July 1941, the British Government prohibited the importation of silk from Japan, and manufacturers could sell only what they had on hand and goods then in transit. An affidavit of Frank Leslie Freegard of A. O. Aldwinckle & Co., Ltd., manufacturer of the merchandise here involved, states that the remainder of the merchandise they had on hand was sold on February 4, 1942, to Franc-Strohmenger and Cowan, Inc., and that since that time no sales or offers to sell have been made by them. An affidavit of Arthur Charles Davis of Brocklehurst-Whiston Amalgamated, Ltd., a competing firm, states that the balance of their material was sold in November 1941. Other uncontradicted evidence indicates that such merchandise was not freely offered in October 1942; that it was impossible to buy it; and that there were no offers of the merchandise later than 2 or 3 weeks after the freezing order.

Since there is evidence that this material was not sold for home consumption, the first question to be considered is whether or not an export value existed at or near the date of exportation (October 1942). Mr. James McCurrach stated that only three or four or five people sold this type of merchandise. The above-mentioned affidavits from two of them indicate that they had nothing to sell in October 1942. Mr. McCurrach testified that no offers to sell were made in October 1942; that by October 1942 no trace of the material existed. Section 402 (d) of the Tariff Act of 1930 provides that the export value shall be the market value *at the time of exportation* at which such or similar merchandise is "freely offered for sale to all purchasers." In October 1942, such or similar merchandise was not being offered, freely or otherwise. How then can an export value be found?

I do not think the case of *White, Lamb Finlay, Inc.* v. *United States,* 29 C. C. P. A. 199, C. A. D. 192, can have any application to a situation like this. In that case it was held that where the market value changed between the date of purchase and the date of exportation in the case of goods offered for sale for future delivery, the market value on or about the latter date must be taken for appraisement purposes. There, however, at the date of exportation goods were available and were being offered for sale. Here they were not.

The examiner testified that the advances were made on the basis of an importation by Bachrach Co. from Brocklehurst-Whiston under contract of purchase dated November 25, 1941, which was the last sale made by that manufacturer. Aldwinckle's last sale was made subsequently, on February 4, 1942, at a price less than that charged by Brocklehurst-Whiston. It cannot be presumed, therefore, that the Brocklehurst-Whiston price was the existing quoted price on the date of exportation.

Plaintiff's contention seems to be that the last sales of the merchandise must be disregarded and the price prevailing while there still were goods available, accepted as the export value. Such a value would be based upon a presumption that the goods would have been offered at such prices on the date of exportation had there been any to offer. Clearly, the court cannot make a finding on the basis of such a presumption.

On the record in this case, I do not see how any price can be presumed to have existed on the date of exportation, since nothing was then being offered for sale. It follows that at the time of exportation, there was no export value for the merchandise. Plaintiff has failed to prove its main contention that its claimed export values are the dutiable values.

Although plaintiff has failed to establish a dutiable export value, as claimed, and the appraisement has been shown to be erroneous, section 501, Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, provides that the single judge shall "notwithstanding that the original appraisement may for reasons be held invalid or void" determine the value of the merchandise. There is some evidence in the record as to cost of production, but it was not passed upon by the trial court. Therefore, insofar as the silk foulard is concerned, the judgment of the lower court should be reversed and the case remanded to the trial judge for further proceedings not inconsistent with this decision.

The situation in regard to the wool cashmere is different. There is no evidence that this material originated in Japan or that the British embargo applied to it. The affidavit of Frank Leslie Freegard, sworn to February 25, 1944, states that his firm was then still engaged

in the production and sale of hand-printed wool cashmere similar to the merchandise involved herein.

The wool cashmere herein was contracted for on November 10, 1939, the order was entered April 9, 1942, and the merchandise was exported on October 1, 1942. The Government offered in evidence an invoice and entry papers in entry No. 701008 involving similar merchandise exported by the same manufacturer as in the instant case. The contract for that merchandise was made on January 30, 1942, the order was entered February 24, 1942, and the material was exported on June 22, 1942. The invoice prices there were higher than those in the instant case. It is plaintiff's contention that the appraiser erred in advancing the value of the instant merchandise— two colored, dyed, blotched cashmere—to 6/11d., when he passed three colored cashmere in entry No. 701008 at 6/2d. and four colored at 6/8d. However, there is nothing to show that the appraiser's advance was based solely on this invoice, nor has plaintiff produced any evidence of market value on the date of exportation. The presumption in favor of the appraiser's action has not been overcome and judgment should be rendered for the Government on this phase of the case.